On behalf of the F1, Mr. Patrick J. Kroon. On behalf of the F3, Mr. Edward R. Sennett. Good morning, counsel. I apologize for the late start this morning. There were some traffic obstacles we had to overcome, so I apologize. All right, Mr. Crimmins. Thank you. You've read over the briefs. I certainly don't wish to assign all the facts to go through the office of proof. I believe that you have everything that you need here to reverse this case. I suggest to you that all of the issues that I've alleged need to not only be looked at individually, but also in the context of each other issue that I've alleged. In other words, when you look at the state of the evidence in this particular case, and what I suggest and argue to you is a weak, weakly supported case, if supported at all, you need to look at the state of the evidence in the context of the issue of ineffectiveness of counsel as well. Because I think when you look at my allegations of error as it relates to the ineffectiveness, you need to scrutinize those allegations in terms of the case itself and the status of the evidence. This is not a domestic battery wherein the victim was battered. The police were called immediately. Observations were made of the victim. Documentation of those injuries were taken immediately. Statements were taken of the victim immediately. The defendant was taken into custody immediately. This is a situation where weeks after this alleged incident, the alleged victim, Miss Jackie Humphrey, went to court under a divorce proceeding to secure an order of protection. It was at that time that the Coppersville Police Department was involved in investigating the allegations of domestic battery. Counsel, looking at the evidence. Sure. Didn't the court rely primarily on testimony of the two witnesses that observed the victim very shortly after the event? The court indicated, yes, that it was a he said, she said type of case. He relied on the friends of the alleged victim and their observations about the injuries, the alleged injuries that they saw. We would argue that there's some inconsistencies in their testimony. We would certainly argue that they have a bias. But aren't these issues of credibility for the trier of fact? Counsel, I mean, under what authority can this court give a different amount of weight to this testimony? Well, I certainly understand that you're to defer to the judge. And I understand that it's an adjudication of credibility. And I understand that that as it relates to that initial argument that I have about that issue, that that's, in fact, an overwhelming consideration. But when you think about the ineffectiveness allegations that I made and the state of this evidence, which I suggest to you is weak. Generally, what Mr. Richards did not do in terms of impeachment, what he did not do in terms of arguing how this case came to be and how the case was investigated and who was in charge of the investigation, as it were, the genesis of the case that I contend in my brief. And how does that affect what the judge actually heard in the courtroom and made his decision based on? Yes, ma'am. The idea that you're basically forcing a victim to come forward with an allegation that is approximately six weeks old, I think, suggests a variety of things. One of which is why are we compelling the victim to become a complainant? Is that not common in domestic violence cases? It can be common. But as I have indicated throughout this case, the deputy chief of the police department going to the courthouse to investigate a misdemeanor domestic battery is not common. Matter of fact, he testifies in his offer of proof that he has never done that. So doesn't that doesn't that lend credibility to the victim in light of the fact that she didn't go to the police, that the police heard about the allegations and then came to her and then that they were confirmed, if you will, were caught. Correct. Collaborated, corroborated by the two women. I mean, it's not like a case where a woman runs to the police department six weeks later and says, oh, by the way, six weeks ago I was abused. Well, the idea that she didn't wish to cooperate, I don't necessarily think it corroborates the fact that there was a domestic battery. I, as I indicated to you, I think that Mr. Sarto wanted Mr. Humphrey investigated for a variety of personal reasons that really had nothing to do with the actual incident. Well, since you've gone to Mr. Sarto, let's talk about Mr. Sarto. Yes, ma'am. I guess I'm having a problem following the briefs on how it is that Mr. Sarto is such a huge player in this game, if you will. In your eyes. Well, Mr. Sarto, I believe, is compelling the Carpentersville Police Department to investigate this particular case. And how do you know that? Well, I believe if you read the proffered testimony from Chief Newman and Deputy Chief Gillette, they'll talk to you about the fact that Mr. Sarto was interested in seeing to it that this matter be investigated. He sent a variety of emails. He indicated his interest was simply because Mr. Humphrey was a trustee with the village. But you can read throughout the proffers that there is a contentious history between Mr. Sarto and Mr. Humphrey. And all that goes to Judge Halleck's relationship with Mr. Sarto and the disclosure issues that we talk about in our third allegation of error. But what evidence is there that the judge knew about this contentious relationship or what Mr. Sarto did? Wasn't it the fact that they merely had gone to the same high school and were years apart and were not social friends or acquaintances? Well, you know, as I talk in my brief, the disclosure that Judge Halleck makes, I describe it as incremental because it seems to keep coming throughout the course of the proceeding. Well, then the most serious of the disclosures ends up where with regard to the relationship between the judge and Mr. Sarto? I would suggest to you that the most serious is the omissions, the failure to disclose. That they went to high school together? Judge Halleck had a variety of opportunities. As you know, the initial disclosure was right after the opening statement. Judge Halleck knew that there was political background to this particular incident. Well, that first disclosure was with regard to Judy, is it Sigwald? That's correct. Isn't that correct? That's correct. Mr. Sarto's name was not in there. He talked about the fact that he was swearing in. Judy Sigwald. Judy Sigwald's disclosure involved the fact that she worked for Judge Halleck's campaign. Correct. That was the first disclosure. Judy Sigwald did friend-to-friend cards and that kind of thing. And Judge Halleck disclosed that. Judge Halleck obviously knows what it means to have an obligation to disclose. And he does that and he offers the state's attorney the opportunity to ask for a recusal or to move for a substitution. But he doesn't disclose initially his relationship with Judge Sarto. He talks about the fact that he swore in the village president, Judge, I'm sorry. Mr. Sarto. He swore in the village president, Mr. Sarto. But he doesn't go on to say the state of his relationship with Mr. Sarto. What is the relationship? Of all the people or all the judges that Mr. Sarto could choose to have him sworn in, Mr. Sarto chose Judge Halleck. Didn't he choose him by default? Somebody else couldn't do it and he said, oh, ask Halleck. There was a suggestion to that effect. I believe that's what he said. But their same ex-schoolmates, Judge Halleck, dismissed the idea that they knew each other because of the fact that, you know, I was a senior and he was a freshman, that kind of thing. But what Judge Halleck failed to mention at that time was his brother-in-law was on the village board as well, Mr. Whitehouse. Mr. Whitehouse knew Mr. Sarto. He failed to disclose the fact that they worked together at the city of Elgin. In 1901. After high school. Yeah, so that had to be some time ago. But Judge Halleck didn't disclose any relationship after high school. He was of the opinion, well, this doesn't matter because it's high school and it was a long time ago. Let me ask you this. We're dealing with Kane County. I appreciate Kane County is a little bit bigger. We hear cases from Lake Michigan to the Mississippi River in this courtroom. We hear cases where some counties have one or two judges. What are those judges going to do? They know everybody in the town. Well, I suggest to everyone, this court included, that there are obligations, regardless of how small the town is and regardless of how many judges there are, that you have to disclose any potential conflicts of interest, any knowledge of parties or interested parties. Okay, but Mr. Sarto was not a party, was he? He was not a party. Okay, so then what information did the judge have? Can you tell us that the judge had that would have led him to make disclosures? Well, I think what you're suggesting to me is that there's some standard that we have to prove that he actually was. No, I'm just asking a question, counsel. I'm not suggesting. I'm asking the question, what information is there? Is this speculation or is there something more?  He knew that Sarto was involved to some extent. And how involved? Can you amplify on that, please, what you just said? Sarto was involved in the investigation. Did Judge Halleck know that Sarto was involved in the investigation? No. Did Judge Halleck know about the relationship between Sarto and Humford before the trial? I can't say that either. Okay. I don't think I have to say that, though, because what is here is a situation where there's an overwhelming appearance of impropriety because this relationship was only disclosed incrementally and not disclosed fully when it could have been, right after the opening statement, just like he disclosed his relationship with Judy Sigwald. The court has an obligation. We don't get to voir dire the judge on relationships. We don't get to voir dire a judge just like we would a jury. The judge should go take it upon himself or herself to make these disclosures and give the parties an opportunity to work with those disclosures. He did not do that. Over time, he did. I mean, he makes the initial disclosure that he swore in Sarto. There was no disclosure at the time that they went to school together. There was no disclosure that the judge's brother-in-law was a board member as well with the Village of Carpentersville. Wouldn't the defendant have known that? There's no record of the defendant's knowledge to that effect. Now, eventually there was a hearing on the motion for substitution, correct? There was in front of Judge Ware. By a different judge, right. And that motion then was denied. That motion was denied. You can read the order where I was compelled to make some disclosures, which I don't believe is in the Code of Criminal Procedure, but Judge Wagner made me make some disclosures. Judge Wagner decided who would be called and who wouldn't be called, and Judge Wagner expedited the hearing and denied the motion. My point here is that these disclosures were incremental, and I clearly think that given the relationship of Sarto to this case and Judge Halleck's relationship with Sarto, and the fact that he failed to disclose the extent of that relationship, I think we have a problem here in terms of impartiality. I think a reasonable person could question the impartiality issue here as it relates to Judge Halleck. Let's look at the April 30th disclosure that Judge Halleck made outside of the presence of the defendant. How does that relate to incompetence of counsel? If the judge fails to disclose information, the problem is focused on the judge, in your argument, not the attorney. I have to make both arguments. I have to suggest to you that Van Richards, the trial counsel at that point in time, needs to inquire of Judge Halleck about the state of his relationship with Sarto at that time. At the same time, he makes that initial disclosure after the opening statement. After he makes the opening statement, Sarto says, I think I swore this guy in, or Halleck says, I think I swore this guy in. And it's incumbent upon the attorney to say, well, tell us more. Do you know of any other ways? Have you gone to high school with them? How do you know it? We shouldn't have to ask that question. The judge shouldn't be forthcoming with that. But that information, excuse me, counsel, but that information actually was not disclosed initially. No. So the attorney, Mr. Richards, didn't know that. He didn't ask. So you're saying because of the disclosure made regarding Judy Sigwald, he should have asked about Mr. Sarto? And his relationship. But was Mr. Sarto's name mentioned in that first disclosure? I believe the idea is that he indicated that he swore in Village President William Sarto and another village trustee whom he did not recall following the opening statement. Back to the point I was trying to make, if I can remember, Mr. Humphrey himself, after Judge Halleck discloses, wants to say something about that. At that very point in time, Judge Halleck says, counsel, go talk to your client. And that's the end of it. So Mr. Humphrey chimes in. He wants to talk about it. Mr. Richards doesn't want to talk about it. I'm suggesting that had Mr. Richards asked more questions at that point in time, decisions could have been made at that point in time, right after the opening statement, before we got to, through all the evidence and we got to a verdict and everything else, that would have been the appropriate thing to do. Van Richards did not do that at that time. So with respect to ineffective assistance, you need to meet the two Strickland standards. I understand. And you're submitting to us that had you met the first Strickland standard, then the second one would have been met that but for the results of this trial would have been different. That's correct. Well, different in the fact that a different judge should have been presiding over it. Well, that's not what the standard is. with respect to whether or not the outcome of the trial would have been different, correct? Well, I can only say this. Give me a new judge. I get my right to a jury trial back. We can speculate about the outcome. You're right. I mean, that is the standard, I suppose. But Mr. Richards has an obligation to inquire of Judge Halleck. Just as if a juror had said something during a trial or something had happened during a trial, we have an obligation to inquire as to whether that juror has obtained it to some extent. So that's my suggestion. I have made a variety of other allegations of ineffectiveness against Mr. Richards, but they all go to credibility, really. Impeachment, failure to impeach, that type of thing. Counsel, you'll have an opportunity on rebuttal to address some of those. The bell just went off. I'm sorry. But you'll have additional time to address those points. Thank you very much. Thank you. Mr. Katsika. May it please the Court. Good morning, Your Honors. Good morning. My name is Edward Katsika. I'll argue on behalf of the people this morning. I'd like to spend some time talking about the main issue you discussed with opposing counsel, and that is the extent of any contact between Bill Sardo and Judge Halleck demonstrated on this record. The word relationship was used a lot when opposing counsel was describing contact between Justice Halleck and Bill Sardo. There's no relationship on this record. As you pointed out, Justice Shostak, there's basically four things, four areas of contact between the two. They went to the same high school. Judge Halleck was a freshman when Bill Sardo was a senior. They weren't social friends. They just went to the same high school. Sardo was sworn in by Justice Halleck as a village board member. The two of them worked together in different departments for the city of Elgin several years before the trial. There's no reason to believe that Judge Halleck would have this stuff in his mind when he starts hearing this case. Sardo's not even a party to the litigation. He's alleged to be some sort of mastermind behind the prosecution, the people which have been unsupported by any evidence. But he's not a party to the case. There's no reason for it to be in Justice Halleck's mind at the beginning of this litigation, these minimal areas of contact he had with Bill Sardo. Had he disclosed any, once he saw Mr. Sardo and he started disclosing it, wouldn't it have been proper for him to disclose it all so that Mr. Humphrey, if he wanted to, could have? Well, what happened here is before trial he disclosed that he had sworn Sardo in. Presumably that's all he remembered or knew. After trial, several weeks after trial when the case was on post-judgment motions, Judge Halleck got this call from his brother-in-law that opposing counsel was attempting to bring up in his argument, that his brother-in-law got this strange call from someone purporting to be Bill Sardo regarding some sort of investigation. And it's at that time this other information came out, and people expect that it came out at that point most likely because that's the only time Justice Halleck remembered it. I mean, we're talking about going to high school, someone you went to high school with multiple years before the trial, and they weren't even in the same class. To say that the two had some sort of relationship is just uncertain. But there was some sort of argument that Van Richards should have followed up more on each of the disclosures than he did. Well, the only pretrial disclosure was that he had sworn him in. I mean, what's the follow-up there? It's not unreasonable for a defense counsel just to take that disclosure as it was and not follow up with anything. Well, couldn't there be an appearance of impropriety with respect to that counsel? No, Your Honor, because there's no relationship here. Well, does there have to be a relationship? I mean, was there a relationship in the O'Brien case? Wasn't that just a casual wave on the part of one of the parties to the judge who belonged to the same health club? Well, and if you'll recall, Your Honor, I believe Justice Jorgenson wrote the majority opinion in that. There was no appearance of impropriety held in that case. The court debated over what the proper standard was, prejudice or this Rule 63 appearance of impropriety, and the court said, That's ridiculous. A wave at a health club? That's not an appearance of impropriety. And the contact here is probably even more minimal because any contact that Judge Halleck had with Bill Sardo was years before this case. In the O'Brien case were the actual litigants versus the witness. Exactly. That's another distinguishing factor. But now you're saying with regard to a hearing on a motion for substitution, that the standard to apply is actual prejudice? Well, I acknowledge that this legal issue is in the state of flux, especially within this court. There are several opinions on it that I didn't really discuss in my brief because the court hasn't really reached a conclusion. Just acknowledge the fluctuation in the law. And, for example, in the O'Brien case said whatever the standard is, it's not met here. So there is no, you know, pronouncement by this court or any other court that I know that says Rule 63 creates a right in a litigant. If the court wants to reach that issue, and I can see why it would want to since there is some fluctuation in the law, this isn't the case to do it because of the absurd allegations on the substitution of the judge motion. I can't say them any other way. They're just ridiculous. I don't really understand how counsel can get up here and allege that there's a reason this judge should have accused himself. The context is so minimal. As you pointed out, Justice Shostack, talking to opposing counsel, what are we going to do in little counties where the judge knows everybody? He's not going to be able to hear a case. Well, shouldn't Mr. Richards have gone into questioning with regard to how the case came to be prosecuted? Assuming that there was some, you know, real evidence to support that evidence was being manufactured to frame this fellow, that might be a reason to go into it. But we have three witnesses upon which the court relied to find the defendant guilty of domestic battery for attacking his wife with a baseball bat. I mean, if they could have some reason to believe that those three individuals lied, you know, fabricated their testimony was a lie, then perhaps. But outside of that, the motivation behind the prosecution is irrelevant if the guy did it. But now they didn't see it happen, did they? Their testimony was not with regard to the incident itself. Well, the main witness, the victim, not only saw it, it was done to her. Other than the victim. And the other two witnesses, you're right, Justice Senoff, saw the aftermath of the attack, the bruising on the victim. But absolutely reason to believe that this evidence was fabricated. The motivation behind the prosecution, I think, is irrelevant. What would your position be if there were proof of a very close relationship between Zaito and the judge?  Your Honor, you know, I think Justice O'Malley's concurrence in O'Brien accurately states that we don't really have a good rule regarding or we don't have any real clear case law on Rule 63 and whether it appears to be provided sufficient. I would advocate, as Justice O'Malley did, that Rule 63 doesn't create a cause of action or a right in the litigant. And therefore, a motion for substitution of judge can't be based on it. Had, getting back to your hypothetical, Your Honor, if there was a close relationship demonstrated, I would say it would have been incumbent upon the defendant to raise a due process argument like the Supreme Court did in that Caperton case. Independent of any kind of statutory argument. And if it was a relationship significant as it was in the Caperton case where the litigant donated $3 million to the public court judge who heard his case, then I think you got a reversal there. But that's independent of Rule 63. You know, I hate to go into Rule 63 either because I would feel much more comfortable with the Supreme Court deciding that issue that we talked about in O'Brien. And I am hopeful that they're going to do that in the near future. But does it weakly kind of carve out the ability of a litigant to request a court to recuse themselves under Rule 63? The way I would say it is I think it gives voice to a due process argument for that very same right. I think any citation to Rule 63 is entirely inappropriate because the Code of Judicial Conduct doesn't vest a right in litigants, just like the rules of professional responsibility don't vest a right in litigants. There are codes for practitioners and for judges on how they're there to behave, and they're not, you know, statutes. It certainly would be entitled to a hearing for clause on the potential violation of the rule. Do you agree with that? For violation of Rule 63? Right. Well. And they did have one in this case. Yes. They did have one. The point is that if it's a court of violation of Rule 63, that's fine. That's true. That did happen, and he did cite that in his motion for substitution before the trial court was Rule 63. I would be more comfortable counting in terms of constitutional due process as the Caperton case did. Just touching briefly on the sophisticated evidence, it's credibility and determinations on the part of the judge, as was pointed out when you were talking to the opposing counsel. That kind of thing is for the trier of fact. And the various allegations of ineffective assistance to counsel regarding impeaching the witness on various bases. As I said in my brief, ultimately, I think the material that wasn't brought up could have been as damaging to the defendant as it was to the victim, and you don't get beyond the first problem of strickling if that's the case. So are you saying that was trial strategy? Yes. Yes, especially the stuff about the defendant not paying his alimony or temporary child support. The voicemail dealt mostly with that, and so I thought that would have been very damaging to the defendant. And as you pointed out, Justice Shostak, the prejudice here would be a different result as far as I can tell under strickling law, and there's no indication the result would have been different in this case. I don't understand how you tie the potential of a new judge into prejudice under strickling. That's a leap as far as I'm concerned. There are no other questions. People would ask that this court defer to the defense committee. Thank you. Mr. Crimmins? Thank you. I failed to see how it couldn't be a part of the strickling palm and prejudicial court for a lawyer not to examine a court regarding recusal because how else does the process work? You only have a few methods here. One is the judge does it himself. The other is the lawyer brings it out of the judge, and the judge is forced to do it himself or herself. And the other is the 114-4 where another judge should do it. Here we have a situation where Judge Halleck didn't do it, Van Richards didn't do it, Judge Wagner wouldn't hear it.  Judge Wagner heard it. I'm sorry? Judge Wagner heard it. Well, he heard things that he chose to hear, and he ruled inadmissible other things. Well, there was an offer of proof that's part of the record. Well, I was able to do that, sure, but he wouldn't allow a full hearing. But there is an offer of proof that's part of this record. Yes, ma'am. Back to the April 30th disclosure, I wanted to talk about this a little bit. Judge Halleck talked about the fact that his brother-in-law, Robert Whitehouse, got a call from Bill Sardo, somebody projected to be Bill Sardo, suggesting that an investigator would come over and talk to him about one of the judge's cases. At no point in time did Judge Halleck say anything about the Judicial Inquiry Board during the disclosure of April 30th. When you look at the testimony of Mr. Whitehouse later on, you'll see that Mr. Whitehouse clearly indicated to Judge Halleck that it was the Judicial Inquiry Board. And at that point, what did the judge do or say to his brother-in-law? Did he not tell his brother-in-law, stop, don't tell me anymore, I don't want to know anything more? But with respect, the information about Bill Sardo calling Judge Halleck's brother-in-law about a Judicial Inquiry Board investigation was already in the ears of Judge Halleck at that point. I suggest that the damage was already done. Nothing else had to be said. He knew that Bill Sardo had made a complaint to the Judicial Inquiry Board, that there was an investigation, the Judicial Inquiry Board. Judge Halleck failed to disclose that the Judicial Inquiry Board was involved in the investigation on April 30th. Hold on real quick. Yes. I'm really confused. So we talk about the player. Sardo doesn't like the defendant, allegedly. Yes. And he's, in your mind, close with the judge. Why did he call and make a complaint to the Judicial Inquiry Board? Well, I don't know the timing of the investigation. As you know, I tried to subpoena various information from the Judicial Inquiry Board that was quashed. I don't know the timing of it. Well, I guess if Sardo reported him to the JIB, it probably should be the victim who should be irritated at the judge for not recusing himself versus the defendant. Correct? I have no idea. All we know is Judge Halleck knew that there was a Judicial Inquiry Board investigation. If Mr. Sardo is trying to utilize the Judicial Inquiry Board to compel a certain verdict from Judge Halleck, that's inappropriate, obviously. We just don't know the timing of it all. All I know is Judge Halleck didn't disclose it, and I ask why. Why wasn't it disclosed? From the record, it's not really clear that the Judicial Inquiry Board investigation involved Judge Halleck. It's just that Judge Halleck cut off the conversation with the son-in-law very quickly, so you'd have to make an assumption. There's no details. Plus the fact there's plenty of law. If you're a defendant and you want to change a judge, just write a complaint to the Judicial Inquiry Board. And if you're taking the position that even if it were Judge Halleck, you'd be entitled to a change, that's not the law. I understand, and certainly I'm not advocating the manipulation of the system by invoking the Judicial Inquiry Board. But it's just another non-disclosure, or another non-complete disclosure that is bothersome, I think, in the context of everything. The totality of everything. Didn't the brother-in-law say, I think he was questioned about the Judicial Inquiry Board, Ian Sardo, and I think he said, well, it's not tough to put two and two together. So he came to that conclusion himself, is what the brother-in-law, is it Whitehouse, said? His testimony, I think, was, quote-unquote, it's pretty easy to put two and two together. Yes, ma'am. So isn't that speculation, that the reason he was reported to the JIB was because of Sardo? Well, I believe Mr. Sardo in the offer of proof talks about the JIB investigation a little bit. Afterwards. Afterwards, yes. Right. But my point is simple. It wasn't disclosed, and Judge Halleck knew the Judicial Inquiry Board was mentioned. One other issue. Yes, ma'am. When Judge Halleck spoke and made a disclosure on the record, didn't he say also to Mr. Richards, I see your partner virtually every Sunday morning in church? So I guess he didn't disclose that, but I think what his thinking was is, if I see your partner every Sunday morning in church and I haven't seen Sardo for how many years and don't have a relationship with him, how is there a conflict? Just by seeing a lawyer in church, I don't think necessarily means anything. He probably has more contact, wouldn't you think, with the ex-partner or with the partner than he does with Sardo. And there was no issue as to whether he disclosed or failed to disclose that, and there's no issue as to whether the partner was involved in the case in any fashion. It's distinguishable. I understand what you're saying. I'm not a judge. You are judges, and obviously this is a sensitive situation for you. My point is, Caperton, I think, talks about the fact that we don't have to prove actual prejudice here. We don't have to prove actual knowledge, scienter, or anything else. Well, Caperton is a little different, isn't it? Well, Caperton is distinguishable, but I think it talks about the recusal obligations of the court, and I think it talks about a reasonable perception of whether there's, in fact, a fair tribunal. And I think if you look at this record, look at the offer of proofs that I've submitted, look at the state of the evidence and how weak this case actually is, look at what Mr. Richards did and didn't do, I think this recusal issue is significant. Now, again, if the defendant confessed to the domestic battery, if the police came to the scene immediately, it was a strong case. I don't think any of this matters, really, and I don't think we would be here, but obviously this is a weak case. And so we need to give scrutiny to Judge Halleck's behavior, his failure to disclose, his incremental disclosures. We need to scrutinize Van Richards' behavior, what he did and didn't do. So that's what I'm suggesting to this court, and that's why I think all three issues need to be looked at together. I understand that Caperton is distinguishable, but I think it does say to us we need to look at what a reasonable person might think in terms of an actual bias. You don't have to prove an actual bias, but if there's a risk of actual bias, then that's one we have to recuse. And I think in this case, this case speaks loudly that there's risk of actual bias here. Now, I don't have proof that Judge Halleck and Bill Starr golfed together or anything else, but it's not required. I think by the failure of Judge Halleck to disclose appropriately in a timely fashion, I think the court can read into that some things as well. So I welcome the court's review. I thank you for your time, and I ask that the verdicts be reversed. Thank you very much. Thank you. Thank you, counsel. The court will take the matter under advisement and render a decision in due course. Court stands in recess. Thank you.